640 F.2d 404
 205 U.S.App.D.C. 318
 Noel MORRIS et al., Appellants
v.
James G. WATT in his official capacity as Secretary of the
Interior, a federal office et al.
Darias CRAVATT et al., Appellants
v.
James G. WATT, in his official capacity as the Secretary of
the Interior et al.
 Nos. 79-2127, 79-2276.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 18, 1980.
Decided Jan. 27, 1981.
As Modified March 23, 1981.
 
 Ellen Leitzer, Albuquerque, N. M., with whom John J. Kelly, Albuquerque, N. M., was on brief, for appellants.
 James Brookshire and Dirk D. Snel, Attys., Dept. of Justice, Washington, D. C., for appellees James G. Watt, Secretary of Interior, et al. James W. Moorman, Asst. Atty. Gen., Jacques B. Gelin and C. David Redmon, Attys., Dept. of Justice, Washington, D. C., were on brief, for appellees, Watt, Secretary of Interior, et al.
 Lon Kile, Hugo, Okla., with whom Paul M. Niebell, Washington, D. C., was on brief, for appellee, Overton James, et al.
 Before McGOWAN, EDWARDS and GINSBURG, Circuit Judges.
 Opinion for the court written by Circuit Judge EDWARDS.
 EDWARDS, Circuit Judge:
 
 
 1
 The appellants in these consolidated cases are individual members of the Choctaw and Chickasaw Nations, three County Chickasaw Councils, and the Choctaw General Council. Appellants, all of whom are from Oklahoma, filed suit in September of 1977, in the United States District Court for the District of Columbia, against the United States Department of the Interior, the Governor of the Chickasaw Nation, and the Principal Chief of the Choctaw Nation. In their action below, appellants sought to
 
 
 2
 resolve certain questions concerning the legitimacy of the present forms of government of the Choctaw and Chickasaw Nations of Indians, the validity of the Choctaw Constitution of 1860 and the Chickasaw Constitution of 1867, and the authority of the Principal Chief of the Choctaw Nation and the Governor of the Chickasaw Nation to spend tribal funds without prior authorization from the traditional legislative arms of the Choctaw and Chickasaw Nations the Choctaw General Council and the Legislature of the Chickasaw Nation as required by the provisions of the 1860 Choctaw Constitution and the 1867 Chickasaw Constitution respectively.
 
 
 3
 Appellants' brief at 3. Appellants also sought
 
 
 4
 declaratory judgments upholding the validity of the 1860 Choctaw and 1867 Chickasaw Constitutions, and appropriate injunctive relief compelling defendants to cooperate in and facilitate the establishment of the governments of the Choctaw and Chickasaw Nations under their respective constitutions.
 
 
 5
 Appellants' brief at 8.
 
 
 6
 During the pendency of these suits, the incumbent governments of the Chickasaw and Choctaw Nations, with the approval of the Bureau of Indian Affairs, held referendum elections on proposed new Constitutions. Thereafter, the voters in both Nations adopted the proposed new Constitutions for the Chickasaws and the Choctaws. The District Court then validated the results of the elections, having found that the procedures followed by the incumbent Choctaw and Chickasaw governments conformed to those validated by this court in Harjo v. Andrus, 581 F.2d 949 (D.C.Cir.1978),[1] and dismissed appellants' complaints as moot.[2]
 
 
 7
 Appellants filed the instant appeal asserting the continued validity of the 1860 and 1867 Constitutions, and alleging that the new constitutional governments were invalid because the referendum elections did not conform to the amendment procedures outlined in the old Constitutions. Appellants' brief at 13-22. Appellants also argue, in the alternative, that even if the 1860 and 1867 Constitutions are no longer enforceable, neither the procedures outlined in Harjo, nor the regulations promulgated by the Bureau of Indian Affairs governing election procedures for certain tribes, were followed by the tribal governments in ratifying the new Constitutions. Id. at 22-24.
 
 
 8
 Appellants now seek threefold relief. First, appellants ask this court to vacate the dismissal of the Choctaw and Chickasaw complaints and reinstate the actions below. Secondly, appellants seek a declaration that the 1860 Choctaw and 1867 Chickasaw Constitutions continue to be the only valid Constitutions of those Nations. Finally, appellants request this court to direct the District Court to fashion relief designed to reconstitute and convene the Choctaw General Council and the Legislature of the Chickasaw Nation under the 1860 and 1867 Constitutions. Id. at 26.
 
 
 9
 While we agree with the District Court that the issues raised in this litigation are very similar to those raised by members of the Creek Nation in Harjo, and that the relief mandated by Harjo is appropriate for this case, we find that the referendum procedures followed by the Choctaw and Chickasaw governments fell far short of the procedures approved in Harjo. We therefore remand this case to the District Court with directions to establish new procedures consistent with those followed in Harjo, in order to ensure fair elections that will accurately reflect the desires of the tribal members.
 
 I. BACKGROUND
 1. The Harjo Decision
 
 10
 Throughout these proceedings, much reference has been made to Harjo v. Kleppe, 420 F.Supp. 1110 (D.D.C.1976), aff'd sub nom. Harjo v. Andrus, 581 F.2d 949 (D.C.Cir.1978). Because the issues raised in Harjo are similar to those raised by the Choctaw and Chickasaw appellants in this litigation, it will be instructive here to briefly review the Harjo decision.
 
 
 11
 In 1974, members of the Creek Nation, which is also located in Oklahoma, filed suit in federal District Court to enforce the original laws and the 1867 Constitution of the Creek Nation. The plaintiffs in Harjo sought declaratory and injunctive relief against the policy and practice of the Interior Department in recognizing and dealing with the Principal Chief of the Creek Nation, as the sole embodiment of the Creek tribal government, and in refusing to recognize, facilitate, or deal with a Creek National Council as a coordinate branch of the tribal government responsible for certain legislative and financial functions. 420 F.Supp. at 1114. In an exhaustive and thoughtful opinion, Chief Judge Bryant ruled that the basic Creek tribal government adopted under the 1867 Constitution had not been dissolved by any intervening acts of the federal Government. Judge Bryant held, in particular, that: the Creek National Council had not been stripped of its power to determine most uses to which tribal funds are to be put; the elected legislature created by the 1867 Constitution remained as the authoritative body for initial allocation of tribal funds; and no intervening acts of the federal Government had either the intent or effect of investing the Principal Chief with the authority to determine the purpose to which tribal funds should be put. 420 F.Supp. at 1143.[3]
 
 
 12
 The remedy fashioned in Harjo was premised on the District Court's declaration that "the basic legal framework governing the management of Creek tribal affairs, financial and otherwise, is the Creek Constitution of 1867." 420 F.Supp. at 1143. After first determining that the Creek National Council, as contemplated by the 1867 Constitution, had not existed since about 1916, the District Court determined that it "must devise some mechanism for the restoration of legality to the administrative and disbursement operations of the federal defendants, which necessarily requires the reestablishment of a constitutional Creek government including a national legislature." 420 F.Supp. at 1144. The court took care not to mandate any specific type of institution or organization, providing instead for Creek self-determination.[4] To accomplish this, the court ordered that a referendum be held among all Creek adults on certain issues raised by a recently drafted proposed new Constitution for the Creek Nation.[5] The court stated:
 
 
 13
 In the present circumstances, where the legislature itself is irremediably unavailable, consent for fundamental political decisions may only be obtained from the ultimate source of legislative authority, the people themselves. In the present circumstances, where there is broad concensus on the general framework of the institutional arrangements to be implemented, with certain well-defined basic questions remaining to be authoritatively settled, a feasible and appropriate approach would be to consult the members of the tribe directly, by means of a referendum on each of the three basic questions posed by the draft constitution.[6]
 
 
 14
 The results of this referendum were to be incorporated into a new constitution for the Creek Nation by a commission composed of two tribal members chosen by the Creek plaintiffs, two tribal members chosen by the Principal Chief, and "a fifth member, who shall serve as chairperson, (who has been) selected by unanimous vote of the other four members, and (who) need not necessarily be a member of the tribe." 420 F.Supp. at 1146. Once the redrafting process had been completed, and the final draft had been submitted for approval by the Bureau of Indian Affairs, the commission's work under the court order was terminated.[7]
 
 
 15
 In a subsequent order supervising the referendum election,[8] the District Court in Harjo ordered that the following measures be taken to insure a fair and honest election:
 
 
 16
 (1) Voting was to be conducted at recognized polling places under the supervision of the Creek Constitutional Commission, with one representative each from the Election Board and the tribal plaintiffs group monitoring each polling place. Each pairing of representatives was to be responsible for collecting absentee ballots from the Post Office each day, certifying the number of envelopes received, and insuring the proper safekeeping of the absentee ballots until opened on election night;
 
 
 17
 (2) Each eligible tribal member was to be mailed, by the Department of the Interior, in the name of the Creek Constitutional Commission, a package containing a Notice of Constitutional Election, Plaintiffs' Statement of Views Regarding Election Issues, and Defendants' Statement of Views Regarding Election Issues; and
 
 
 18
 (3) A notice "suitable for publication in the Oklahoma news media reflecting the change in the election date and a further clarification of the election procedures that will govern the election" was to be prepared by the Bureau of Indian Affairs in the name of the Creek Constitutional Commission. App. at 77.
 
 2. Significance of Harjo
 
 19
 The Creek, Chickasaw and Choctaw Nations are recognized in the United States as belonging to the Five Civilized Tribes.[9] The decision in Harjo is important here because, over the years, the Five Civilized Tribes have been accorded similar treatment by the executive and legislative branches of the federal Government. Thus, much of the legislative history cited in Harjo, interpreting intervening acts of Congress as they might affect tribal self-determination under the 1867 Creek Constitution, is relevant here with respect to the authority of tribal governments under the 1867 Chickasaw and 1860 Choctaw Constitutions.
 
 
 20
 The District Court in Harjo concluded that the three major legislative acts covering the Five Civilized Tribes the Five Tribes Act of 1906,[10] the Oklahoma Indian Welfare Act of 1936,[11] and the Act of October 22, 1970,[12] were enacted to enhance, not undermine, tribal self-government in existence under the nineteenth century Constitutions. As this court has previously noted, "the district court (in Harjo ) undertook an extended, studious, and excellent analysis of the effect of federal treaties and statutes on the government of the Creek Nation." Harjo v. Andrus, 581 F.2d at 951. Since we find this analysis to be significantly applicable to the Choctaw and Chickasaw Nations, and since the federal appellees have conceded the application of Harjo to the instant case, App. at 47, 52, we accept the basic principles enunciated in Harjo as binding in this action.
 
 
 21
 3. The Facts Underlying The Actions Brought By The Choctaw
 
 
 22
 and Chickasaw Appellants
 
 
 23
 Appellants in the instant consolidated actions are seven individual members of the Choctaw tribe, six individual members of the Chickasaw tribe, the Choctaw General Council and three County Chickasaw Councils.[13] Appellees, defendants in the actions below, include various officials of the Department of the Interior and the Bureau of Indian Affairs ("BIA") ("federal Appellees"), the Principal Chief of the Choctaw Nation and the Governor of the Chickasaw Nation ("tribal Appellees").[14] Appellants filed suit in the United States District Court for the District of Columbia on September 26, 1977, seeking
 
 
 24
 a declaratory judgment of the validity of the Chickasaw Constitution, and for appropriate injunctive relief compelling the defendants to cooperate in and recognize the reorganization of the government of the Chickasaw Nation along the lines mandated in the Constitution.... In addition to declaratory and injunctive relief in respect to the Chickasaw Constitution, plaintiffs also seek preliminary injunctive relief prohibiting defendants or any of them from spending Chickasaw tribal funds or disposing of Chickasaw tribal assets, including the Chickasaw interest in the Arkansas Riverbed, pending the resolution of this action, and, should they prevail, pending the convening of the Chickasaw legislature and its approval of said expenditures and dispositions.
 
 
 25
 Complaint, Cravatt v. Andrus, C.A. No. 77-1664, at 1-2.[15]
 
 
 26
 On January 20, 1978, federal appellees filed a status report indicating that the Secretary favored the tribes' entitlement to a "functioning constitutional government of their choice." App. at 48. In a subsequent filing, federal appellees also stated that they would not relitigate the basic issues already resolved in Harjo v. Kleppe, 420 F.Supp. 1110 (D.D.C.1976), aff'd sub nom. Harjo v. Andrus, 581 F.2d 949 (D.C.Cir.1978). App. at 53.
 
 
 27
 On federal appellees' motion, the cases were consolidated on July 26, 1978. By separate motions, tribal appellees moved for summary judgment,[16] to which federal appellees responded by reemphasizing the position taken in the status report filed January 20, 1978.[17] In addition, federal appellees noted that the BIA had conferred with the Governor and Principal Chief of the Nations, in an effort to help select a process for effecting the goal of constitutional government, and urged the District Court to "enter one order permitting all parties to proceed with all deliberate speed to establish full constitutional Government based on popular referenda." App. at 53. Appellants then moved for partial summary judgment on the issues of the validity of the 1867 and 1860 Constitutions, and the legitimacy of the existing tribal governments.[18]
 
 
 28
 While these motions were pending before the District Court, the Chickasaw Governor and Principal Chief of the Choctaws mailed ballots to members of their respective tribes for a referendum on proposed new Constitutions prepared by tribal drafting committees.[19] In accordance with BIA regulations governing tribal elections, the Choctaw government submitted its draft Constitution to the Commissioner of Indian Affairs, and received approval on March 21, 1979, subject to ratification by the Choctaw voters.[20] In contrast, the Chickasaw government received technical assistance from the Bureau during the drafting stages, but when prior approval "was too slow in coming, it was decided to commence the referendum based on the inherent right and sovereign authority of the Chickasaw people to self-government and seek Bureau approval if the Chickasaw people voted in favor of the new proposed constitution."[21] Appellants sought,[22] and were denied,[23] a temporary restraining order and preliminary injunctive relief to halt the referendum. The District Court did, however, grant part of appellants' request for immediate relief and impounded the ballots.
 
 
 29
 The District Court issued an order on February 15, 1979 prescribing the method for the collection, counting, and certification of the results of the returned ballots, and providing for court-supervision of these activities.[24] The court ordered that the impounded ballots be delivered to a designated location and counted by two representatives, one from each party, and tallied by a third person selected by the Department of the Interior with the approval of the parties. In addition, each of the parties was entitled to up to two observers each at the counting. Any disputed ballots were to be presented to the court for examination and resolution.
 
 
 30
 In compliance with the above-mentioned order, the parties filed a joint statement of the results of the Chickasaw referendum, indicating that the new Constitution was ratified by a vote of 1,299 to 116.[25] On June 29, 1979, the Chickasaw Constitution was approved by the Bureau of Indian Affairs.[26] The Choctaw Constitution was submitted to the voters of the Choctaw Nation and ratified on May 17, 1979, by a vote of 1,528 to 1,226.[27]
 
 
 31
 By Memorandum and Order, the District Court dismissed the Cravatt action on May 31, 1979 and the Morris action on June 25, 1979, ruling that the issues in both actions had been mooted by the constitutional referenda.[28] In making these rulings, the District Court found that the referendum elections held by each tribe were consistent with the procedures outlined in Harjo. With respect to the Chickasaw election, the District Court stated:
 
 
 32
 First, the committee which drafted the 1979 Chickasaw Constitution was composed of a cross-section of individuals from the Nation by age, sex, and geographic location. Second, before the constitution was submitted to the Chickasaw people, good faith efforts were made to register as many voters as possible and publicity concerning the constitution was circulated. Third, the Chickasaw registered voters were mailed ballots and a copy of the constitution, and the voters overwhelmingly approved the new constitution. Accordingly, the Court finds that the Chickasaw Nation has effectively and legally replaced the 1867 constitution with the 1979 constitution in a manner consistent with the procedures outlined by the Court in Harjo.
 
 
 33
 App. at 69-70. In finding that the Choctaw election procedure was in compliance with Harjo, the District Court stated:
 
 
 34
 First, the committee which drafted the new constitution was made up of members of the tribe who had been selected by the Choctaw people to hold positions in the county councils. In fact several members of the committee who drafted the constitution are plaintiffs in this action who have indicated to the Court that they no longer support the prosecution of this action. Second, the Choctaw people were made aware of the contents of the 1979 constitution through the tribal newspaper, and community input was solicited. Third, the referendum was conducted under the rules and regulations of the Department of the Interior, with proper procedural safeguards, and the Choctaw people ratified it. Accordingly, the Court finds that the Choctaw Nation has effectively and legally replaced the 1860 constitution with the new constitution in a manner consistent with the procedures outlined by the court in Harjo.
 
 
 35
 App. at 74.
 
 II. ANALYSIS
 
 36
 Appellants now seek reversal of the District Court's determination that their actions for declaratory and injunctive relief were mooted by the constitutional referendum held by each tribe. Appellants ask this court to reinstate the dismissed actions in the District Court, to declare the validity of the 1860 and 1867 Constitutions, and to direct the District Court to fashion appropriate relief designed to reconstitute and convene the Choctaw General Council and the Chickasaw Legislature. Appellants' Brief at 26.
 
 
 37
 Appellants argue that the 1860 Choctaw and 1867 Chickasaw Constitutions are the only valid Constitutions for the two Nations. Appellants also contend that the old Constitutions were never legally eradicated and their validity was not extinguished by the tribes' failure to convene their national legislatures under these Constitutions. This question, they argue, was never addressed by the District Court. Moreover, appellants argue in their brief that the application of Harjo principles to the Choctaw and Chickasaw cases is misguided because the impediments to reconstituting and reconvening the national legislatures that existed in the case of the Creek Nation do not exist in the cases of the Choctaw and Chickasaw Nations.[29] Appellants argue finally that, even if Harjo -type relief is appropriate to the Choctaw and Chickasaw constitutional referenda, the federal and tribal appellees failed to fully comply with the relief specified in Harjo and, in addition, failed to comply with applicable federal regulations.
 
 
 38
 Appellees respond that the District Court's implementation and approval of the constitutional referendum remedy was an exercise of the court's equitable discretion, and that such discretion was not abused.
 
 1. The Validity of the Old Constitutions
 
 39
 The first issue to be resolved here is appellants' claim that, since the 1860 Choctaw and 1867 Chickasaw Constitutions are valid documents, the District Court erred in refusing to reconstitute and reconvene the tribal legislative bodies under the old Constitutions.
 
 
 40
 In Harjo, the District Court concluded that "the basic legal framework governing the management of Creek tribal affairs, financial and otherwise, is the Creek Constitution of 1867."[30] However, because it found that the Creek National Council had not been convened since 1916, the court ruled that the legislative body under the old Constitution was "irremediably unavailable."[31] In order to deal with this problem, the court in Harjo reasoned that, since the old legislature could not be reconstituted,
 
 
 41
 consent for fundamental political decisions may only be obtained from the ultimate source of legislative authority, the people themselves.
 
 
 42
 420 F.Supp. at 1146.
 
 
 43
 The court in Harjo was unwilling to ignore the proposed new Constitution for the Creek Nation because, as the court noted,
 
 
 44
 the document does represent a concensus (sic) of the members of the tribe on at least a certain basic level, viz, that the tribe should have a tripartite constitutional government along lines evolved from Creek tradition and history and capable of effectively meeting the challenges of tribal affairs in years to come. As noted earlier, in such circumstances it would be paradoxical for the Court to frustrate such an evident step towards self-determination by fashioning an order which ignored it entirely.
 
 
 45
 420 F.Supp. at 1145. However, in recognition of the continued validity of the old Constitution, the decision in Harjo observed that:
 
 
 46
 (T)he Court's responsibility is to ensure that its order results in compliance with the law, and in the present context this means that whatever fundamental institutional arrangements are finally settled upon be arrived at through procedures as fully compatible with the 1867 constitution as possible, given the circumstances. To do otherwise and allow the present document to be approved without further action would constitute a repudiation of the Court's conclusion that the Principal Chief, under whose auspices this proposal was drafted, is not the sole embodiment of Creek tribal authority, and would further constitute a ratification of the illegal policies of the Department of the Interior which brought about the current situation.
 
 
 47
 420 F.Supp. at 1145.
 
 
 48
 In urging a rejection of the rationale of Harjo, the appellants in this case contend that the considerations causing the Harjo court to declare the Creek legislature "irremediably unavailable" are not present here. First, appellants argue that, unlike the Creek Constitution, which called for a government based on traditional matrilineal social units denoted as tribal towns, the old Choctaw and Chickasaw Constitutions envisioned legislatures that correspond to easily delineated geographic districts within present day eastern Oklahoma. Second, appellants argue that, unlike the 1867 Creek Constitution, the 1860 Choctaw and 1867 Chickasaw Constitutions set forth specific procedures for constitutional amendments. "Thus," appellants argue, "on a practical level, unlike the Creek situation if their 1867 Constitution had been revitalized, it would not be necessary to devise a lengthy and complicated series of referenda within the Choctaw or Chickasaw Nations to modify the 1860 and 1867 Constitutions, respectively, if indeed it would be necessary to amend or modify those documents." Appellants' brief at 21.
 
 
 49
 While we accept appellants' contention that the 1860 Choctaw and 1867 Chickasaw Constitutions have not been repudiated by any lawful acts of the federal Government, we reject their contention that the court below was required to reconstitute governments under the old Constitutions. The District Court, in its Memorandum Opinion in Cravatt v. Andrus, found that:
 
 
 50
 In order to amend the 1867 ... Chickasaw constitution, a national legislature has to approve the amendment. However, ... (the) tribe has (no) such a legislature in existence.
 
 
 51
 App. at 69. Therefore, the court ruled that, pursuant to the decision in Harjo, a "referendum election" was "an appropriate mechanism to re-establish a constitutional government." Id. A similar ruling was reached in Morris v. Andrus with respect to the Choctaw Nation. App. at 73.
 
 
 52
 In light of the decision in Harjo, we can find no error in the judgment of the District Court on this point. It is true that the situations involving the Choctaw and Chickasaw Nations differ somewhat from the circumstances affecting the Creek Nation. However, what is noteworthy is that in all three cases the old legislatures had been out of existence for decades; it was because of this factor that the court in Harjo declined to reconstitute the old legislature under the 1867 Creek Constitution. Although it is theoretically possible to reconstitute governments under the old Constitutions, as a prelude to constitutional reform, this would be unduly time-consuming and impractical. Moreover, although it is impossible to know precisely why tribal members voted to ratify the proposed new Constitutions, these votes give at least some indication of a willingness on the part of tribal members to adopt new Constitutions.[32]
 
 
 53
 For these reasons, and on the authority of Harjo (the applicability of which was conceded by appellants' counsel at oral argument), we affirm the judgment of the District Court allowing for referendum elections to establish new Constitutions for the Choctaw and Chickasaw Nations.
 
 2. The Procedures for Constitutional Reform
 
 54
 While we agree with the District Court that Harjo -type relief is appropriate in this case, we find that appellants' objections to the referendum procedures are well-taken. Serious procedural irregularities existed in the pre-referenda drafting and voter education procedures, as well as in the actual balloting itself. It is because of these irregularities that we find that the integrity of the procedures followed was compromised.
 
 
 55
 In both cases, members voted on an absentee basis by mail. Voting in Harjo, by contrast, was conducted at recognized polling places where representatives from the Creek plaintiffs' group could be present to observe the balloting.
 
 
 56
 Moreover, in Harjo, prior to the final approval of the proposed new Constitution for the Creek Nation, the court ordered that a referendum be held on three "basic questions" concerning some fundamental differences between the old Constitution and the proposed new Constitution. 420 F.Supp. at 1146. The results of this referendum were incorporated by the Creek Constitutional Commission into the final version of the 1978 proposed Creek Constitution. In contrast, Choctaw and Chickasaw electors were never given the opportunity to vote on specific provisions that were fundamentally different from provisions in the 1860 and 1867 Constitutions prior to the inclusion of these provisions in the final drafts of the proposed new Constitutions.
 
 
 57
 In short, there was a general failure on the part of the Choctaw and Chickasaw governments to allow the tribal members to decide basic questions concerning any fundamental changes in the proposed new Constitutions. This had the practical effect of invoking a method of constitutional referendum expressly rejected in Harjo :
 
 
 58
 Another possibility is to rely on the fiction that the up-or-down, yes-or-no final ratification procedure provided for by the proposed constitution affords a meaningful opportunity for members of the tribe to participate in its development. Given the fundamental nature of the changes proposed, this fiction is however little more than that, and it therefore cannot be regarded as an effective or functional substitute for consideration of the document by a legal national legislature. Nor did the hearings held by the drafting committee provide such an opportunity, since they were held before these basic decisions were made and before the changes had been embodied in a draft. Finally, the advisory Council now in existence is so unlike the constitutional National Council in form, function, and role in tribal affairs that its approval cannot be regarded as an effective substitute for consideration and approval by a legally constituted national legislature, even were the advisory Council in fact independent of the Principal Chief.
 
 
 59
 420 F.Supp. at 1145-46 (footnote omitted). The "up-or-down" referendum procedures used here must be rejected for the same reasons as noted in Harjo.[33]
 
 
 60
 In addition, it is not clear from the record below that the District Court limited the input of federal Government officials, as was done in Harjo, in order to ensure self-determination in the process of constitutional reform. 420 F.Supp. at 1147.
 
 
 61
 Furthermore, the efforts made by the Choctaw and Chickasaw governments in educating the electorate prior to the referenda did not satisfy the requirements set out in Harjo. In Harjo, prior to the election, each tribal member eligible to vote received a package containing a notice of the election, and a statement of each party's views regarding the election issues. In contrast, the Chickasaw and Choctaw Nations benefitted only from general press releases appearing in local newspapers, and Choctaw and Chickasaw voters received only a copy of the proposed Constitution, a ballot and a voter instruction sheet. It is not even clear that all Chickasaw and Choctaw voters understood that the old Constitution were in existence.
 
 
 62
 Because of these failures on the part of the tribal governments to fully and fairly involve the tribal members in the proceedings leading to constitutional reform, we reject the District Court's determination that thereferendum procedures complied with the principles enunciated in Harjo.[34] As noted in Harjo, procedures must be "designed to make the vote a meaningful and fully informed one." 420 F.Supp. at 1146.
 
 III. CONCLUSION
 
 63
 These consolidated cases are hereby remanded for further proceedings before the District Court. Upon remand, the District Court is instructed to establish appropriate procedures, pursuant to the principles enunciated in Harjo, for the conduct of new referendum elections. The District Court should act to ensure: full input by representative segments of the tribes in the constitutional drafting, poll watching, and ballot counting procedures; a procedure for voting at polling places; a process to allow tribal members to decide any basic questions concerning fundamental differences between the old and proposed new Constitutions; adequate measures to educate the electorates; and cooperation from appropriate federal Government officials in the conduct of the referendum elections, but with safeguards to protect self-determination in the constitutional reform process.
 
 
 64
 So ordered.
 
 
 
 [1]
 Harjo affirmed a judgment by the District Court reported in Harjo v. Kleppe, 420 F.Supp. 1110 (D.D.C.1976)
 
 
 [2]
 The Memorandum Opinions of the District Court in this case are reprinted in Appendix ("App.") at 66 (Cravatt v. Andrus, No. 79-2276) and 72 (Morris v. Andrus, No. 79-2127). In dismissing appellants' actions, the District Court found it unnecessary to determine the validity of the 1860 and 1867 Constitutions, apparently in part because the federal appellees conceded the validity of the old Constitutions, App. at 48, 52-53, 56-59, and in part because the District Court upheld the validity of the referendum elections
 
 
 [3]
 Chief Judge Bryant observed that, although the Principal Chief had come to perform the functions of the National Council, this had resulted "wholly from the Interior Department Bureau of Indian Affairs' determined use of its raw power over the tribe to bring about that result." 420 F.Supp. at 1143
 
 
 [4]
 The court noted that:
 ... (I)t would be highly anomalous in a case in which the underlying claim is one of self-determination for the Court to vindicate that right by simply mandating the creation of some particular sort of institution or government. It follows then that the re-creation of the constitutional Creek government should be accomplished by the Creeks themselves.
 Moreover, there is no doubt that the tribe as a whole is legally entitled to develop a new constitution to be adopted either as an exercise of the tribe's inherent sovereignty or pursuant to the provisions of the Oklahoma Indian Welfare Act.
 
 
 [420]
 F.Supp. at 1144-45
 
 
 [5]
 This draft was developed by a committee appointed by the Principal Chief, approved by the advisory (tribal) Council after input was received from tribal members, and submitted to the Bureau of Indian Affairs pursuant to the Oklahoma Indian Welfare Act for comments and approval. 420 F.Supp. at 1144
 
 
 [6]
 420 F.Supp. at 1146
 
 
 [7]
 Plaintiffs challenged the District Court's order on appeal, on the ground that the order failed to require the reconstitution and reconvention of the Creek National Council as originally established under the 1867 Constitution. In affirming the District Court's order, this court stated:
 Appellants' argument ... overlooks the very essence of the district court's opinion that the Creek people are entitled to democratic self-government. The court neither directly nor indirectly abolished the essential tripartite government embodied in the 1867 Constitution, but rather left it to the Creek people either to revivify that system along traditional, tribal town lines, or to choose a different means of representation. Thus, the court designed its relief to take into account the needs and desires of all those who would be most affected by its decision the entire Creek nation.... Keeping in mind the broad discretion of the district court in framing equitable relief, and reviewing the record's account of the prolonged denial to the Creek people of the opportunity to express their views on the form and functioning of their government, we find no abuse of discretion in the district court's order in this case.
 Harjo v. Andrus, 581 F.2d 949, 953 (D.C.Cir.1978) (footnote and citation omitted).
 
 
 [8]
 Order, C.A. No. 74-189, March 30, 1979. Reprinted in App. at 76(a)-79
 
 
 [9]
 The Creek, Cherokee, Seminole, Choctaw and Chickasaw tribes comprise the group known as the Five Civilized Tribes. These tribes were culturally and politically sophisticated relative to the Plains Indians, who inhabited the Oklahoma area to which the tribes were forcibly removed from their native southeast by the federal Government under the Indian Removal Act of 1830. Harjo, 420 F.Supp. at 1119. See also Choctaw Nation v. Oklahoma, 397 U.S. 620, 622-26, 90 S.Ct. 1328, 1330-32, 25 L.Ed.2d 615 (1970)
 
 
 [10]
 The Five Tribes Act of 1906, 34 Stat. 822 (March 2, 1906), was passed in response to Congress' earlier plan to terminate the existence of the Five Civilized Tribes. Section 28 of the Act provided that:
 ... (T)he tribal existence and present tribal governments of the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes or nations are hereby continued in full force and effect for all purposes authorized by law, until otherwise provided by law, but the tribal council or legislature in any of said tribes or nations shall not be in session for a longer period than thirty days in any one year....
 With respect to this Act, the District Court in Harjo stated:
 The legal effect of this provision was unmistakeable: Congress had declined to terminate the tribal existence or dissolve the tribal governments, despite all of its earlier intentions to do so, and despite the fact that its failure to do so rendered some of the other provisions of the Five Tribes Act ineffective. While it was anticipated that the tribes would eventually be dissolved, the net effect of the act was to expressly preserve and ratify the then-existing authority of the tribal governments, while reiterating the necessity for Presidential approval of tribal legislation imposed earlier. That section 28 had the effect of continuing indefinitely the existence of the tribe has been confirmed by each court that has examined the question.
 ... Board of County Commissions v. Seber, 318 U.S. 705 (63 S.Ct. 920, 87 L.Ed. 1094) (1943), reh. den., 319 U.S. 782 (63 S.Ct. 1162, 87 L.Ed. 1726) (1943), ... Creek Nation v. United States, 318 U.S. 629 (63 S.Ct. 784, 87 L.Ed. 780) (1943), ... Groundhog v. Keeler, 442 F.2d 674 (10th Cir. 1971).
 
 
 [420]
 F.Supp. at 1129
 
 
 [11]
 The Oklahoma Indian Welfare Act of 1936, 49 Stat. 1967, permitted Oklahoma Indians to take advantage of most of the provisions of the 1934 Wheeler-Howard Act, which ended allotments in severalty, allowed the re-establishment of communal lands, and permitted the organization of tribal governments with control over tribal funds, from which the Oklahoma Indians had been excluded. 420 F.Supp. at 1136. The 1936 Act, now codified as 25 U.S.C. § 502 (1976), provides:
 Any recognized tribe or band of Indians residing in Oklahoma shall have the right to organize for its common welfare and to adopt a constitution and bylaws, under such rules and regulations as the Secretary of the Interior may prescribe. The Secretary of the Interior may issue to any such organized group a charter of incorporation, which shall become operative when ratified by a majority vote of the adult members of the organization voting. Provided, however, That such election shall be void unless the total vote cast be at least 30 per centum of those entitled to vote. Such charter may convey to the incorporated group, in addition to any powers which may properly be vested in a body corporate under the laws of the State of Oklahoma, the right to participate in the revolving credit fund and to enjoy any other rights or privileges secured to an organized Indian tribe under sections 476 and 477 of this title: Provided, That the corporate funds of any such chartered group may be deposited in any national bank within the State of Oklahoma or otherwise invested, utilized, or disbursed in accordance with the terms of the corporate charter.
 (June 26, 1936, ch. 831, § 3, 49 Stat. 1967).
 
 
 [12]
 The Act of October 22, 1970, 84 Stat. 1091, was passed to permit the members of the Five Civilized Tribes of Oklahoma to select their own principal chiefs or governors, rather than accepting such appointments by the Secretary of the Interior. The Act provides:
 That, notwithstanding any other provisions of law, the principal chiefs of the Cherokee, Choctaw, Creek, and Seminole Tribes of Oklahoma and the governor of the Chickasaw Tribe of Oklahoma shall be popularly selected by the respective tribes in accordance with procedures established by the officially recognized tribal spokesman and or governing entity. Such established procedures shall be subject to approval by the Secretary of the Interior.
 Sec. 2. The Secretary of the Interior or his representative is hereby authorized to assist, upon request, any of such officially recognized tribal spokesman and/or governing entity in the development and implementation of such procedures.
 Sec. 3. A principal officer selected pursuant to section 1 of this Act shall be duly recognized as the principal chief, or in the case of the Chickasaw Tribe, the governor, of that tribe.
 Sec. 4. Any principal officer currently holding office at the date of enactment of this act shall continue to serve for a period not to exceed twelve months or until expiration of his most recent appointment, whichever is shorter, unless an earlier vacancy arises from resignation, disability, or death of the incumbent, in which case the office of principal chief or governor may be filled at the earliest possible date in accordance with section 1 of this Act.
 Sec. 5. Nothing in this Act shall prevent any such incumbent referred to in section 4 of this Act from being elected as a principal chief or governor.
 See Harjo, 420 F.Supp. at 1139-40. See also (1970) U.S.Code Cong. & Ad.News 4332-35.
 
 
 [13]
 The County Council appellants in the first of the two consolidated cases, Cravatt v. Andrus, No. 79-2276, are the Carter County Chickasaw Council, the Pontotoc County Chickasaw Council, and the Ponola County Chickasaw Council, all unincorporated associations of members of the Chickasaw Nation. Similarly, the Choctaw General Council in Morris v. Andrus, No. 79-2127, is an unincorporated association of Choctaw people
 
 
 [14]
 Federal appellees named in this action are the Secretary of the Interior, the Assistant Secretary of the Interior for Indian Affairs, Area Director of the Muskogee Area Office of the Bureau of Indian Affairs, Superintendent of the Ardmore Agency Office of the Bureau of Indian Affairs (No. 79-2276) and Superintendent of the Talihina Agency Office of the Bureau of Indian Affairs (No. 79-2127)
 
 
 [15]
 The complaint in Morris v. Andrus, C.A. No. 77-1667, substitutes "Choctaw" and "Choctaw General Council" for "Chickasaw" and "Chickasaw legislature," Complaint at 1-2. Appellants alleged in their complaints that the Governor and Principal Chief of their respective Nations had entered into negotiations to sell or lease the interests of the Choctaw and Chickasaw Nations in the Arkansas Riverbed to the United States at a price set unduly low by BIA appraisers. In engaging in such transactions, appellants alleged that the tribal defendants were exercising powers wrongly granted to them by the federal appellees and were acting wholly beyond the laws and authority granted to them under the 1860 Choctaw and 1867 Chickasaw Constitutions
 
 
 [16]
 Record, Cravatt v. Andrus, C.A. No. 77-1664 at 40, 41
 
 
 [17]
 Reprinted in App. at 52
 
 
 [18]
 Specifically, appellants requested the District Court to resolve three narrow issues: (1) whether the tribal government of the Choctaw and Chickasaw Nations, as provided for in the respective Constitutions of the two tribes, were ever statutorily abolished by acts of Congress; (2) whether the federal appellees acted legally in recognizing the Principal Chief and Governor as the sole embodiments of their respective tribal governments; and (3) whether the federal appellees should permit funds belonging to the Choctaw or Chickasaw Nations to be expended without the approval of a duly elected and constitutionally recognized tribal council. Record, Cravatt, supra at 46
 
 
 [19]
 Cravatt v. Andrus, C.A. No. 77-1664, Memorandum Opinion, May 31, 1979. Reprinted in App. at 66, 68
 
 
 [20]
 Affidavit of Arlene Brown, reprinted in App. at 60, 61
 
 
 [21]
 Findings of Fact and Conclusions of Law, February 15, 1979. Reprinted in App. at 94, 98
 
 
 [22]
 Cravatt Record, at 50, 78
 
 
 [23]
 Cravatt Record, at 53, 63; Memorandum and Order, reprinted in App. at 94, 100
 
 
 [24]
 Reprinted in App. at 100
 
 
 [25]
 Id. at 103-04
 
 
 [26]
 Affidavit of Ellen Leitzer, reprinted in App. at 80
 
 
 [27]
 See Affidavit of Robert M. Pennington, reprinted in federal appellees' brief, Attachment A. See also Affidavit of Arlene Brown, reprinted in App. at 60, 64
 
 
 [28]
 Reprinted in App. at 66, 72
 
 
 [29]
 Although the point is argued in appellants' brief, appellants' counsel at oral argument conceded the applicability of Harjo to these proceedings
 
 
 [30]
 420 F.Supp. at 1143
 
 
 [31]
 Id. at 1146
 
 
 [32]
 In Harjo, the District Court found that, even without an "up-or-down" ratification vote, the proposed new Constitution represented "a concensus (sic) of the members of the tribe on at least a certain basic level." 420 F.Supp. at 1145
 
 
 [33]
 We do not view the District Court's finding of fact that "the proposed constitution was discussed at the October 1978 annual meeting of the Chickasaw Nation, including highlighting the differences between the 1867 constitution and the proposed constitution," App. at 97, as sufficient to meet the requirements of Harjo
 
 
 [34]
 In light of our holdings in this case, it is unnecessary for us to consider whether the referendum procedures that were used violated regulations promulgated by the Bureau of Indian Affairs in 25 C.F.R. § 52, et. seq. (1979). These regulations govern tribal elections and constitutional referenda for tribes organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 461. Appellees quite accurately point out that the regulations apply only to tribes organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 461 and that the Chickasaw and Choctaw tribes were organized under the Oklahoma Indian Welfare Act, 25 U.S.C. § 501. Nevertheless, the main point here is that since the principles enunciated in Harjo control this case, we need not consider the applicability of the BIA regulations