**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 10 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENT CIRCUIT

WILLIAM S. FLETCHER, Individually;
CHARLES A. PRATT, JR., Individually;
JUANITA WEST, Individually; and
BETTY WOODY, Individually; and
on Behalf of Themselves and of All
Other Persons Similarly Situated,

     Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA;
BRUCE BABBITT, Secretary of
Interior; ADA E. DEER, Assistant
Secretary of Interior for Indian Affairs;
GORDON JACKSON, Superintendent
of the Osage Indian Agency;
OSAGE TRIBAL COUNCIL and
each individual member thereof;
CHARLES TILLMAN, JR., as Principal
Chief of the Osage Tribe and Individually;
EDWARD RED EAGLE, SR., as
Assistant Principal Chief of the Osage
Tribe and Individually,

     Defendants-Appellants.

No. 95-5208

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 90-C-248-E)

Karin Johnson Chatfield, Denver, Colorado, for Plaintiffs-Appellees.

F. Browning Pipestem of F. Browning Pipestem & Associates, Norman, Oklahoma (Dena L. Silliman of F. Browning Pipestem & Associates, Norman, Oklahoma, and Robert E. Martin, Tulsa, Oklahoma, with him on the brief) for Defendants-Appellants Osage Tribal Council; Charles O. Tillman, Jr., Principal Chief of the Osage Tribe; and Edward Red Eagle, Sr., Assistant Principal Chief of the Osage Tribe.

Lois J. Schiffer, Assistant Attorney General, Washington, D.C.; Steven C. Lewis, United States Attorney, and Phil Pinnel, Assistant United States Attorney, Tulsa, Oklahoma; Albert M. Ferlo, Jr., and David C. Shilton, Department of Justice, Washington, D.C., on the brief only, for Defendants-Appellants United States; Bruce Babbitt, Secretary of the Interior; Ada E. Deer, Assistant Secretary of the Interior for Indian Affairs; and Gordon Jackson, Superintendent of the Osage Indian Agency.

Tracy A. Labin and K. Jerome Gottschalk of the Native American Rights Fund, Boulder, Colorado, filed an <u>amicus curiae</u> brief for the Osage National Council.

---

Before BALDOCK, BRORBY, and MURPHY, Circuit Judges.

---

BALDOCK, Circuit Judge.

---

Four individuals of Osage ancestry, some of whom were not entitled to vote in tribal elections or hold tribal office because they do not own an interest in the Osage mineral estate or headright, brought this suit to challenge the validity of the franchise restriction and for a declaration on the validity of the Osage Constitution of 1881. Rather than reaching the merits of the complaint, the district court ordered (1) the formation of a constitutional commission to rework the form of the Osage government, (2) an expansion of the franchise to all lineal descendants of the 1908 Osage roll, and (3) a referendum in

2

which the expanded electorate adopted a new Osage constitution. Our jurisdiction arises

under 28 U.S.C. § 1291. Because the district court proceeded without subject matter

jurisdiction in light of the Osage Tribe's sovereign immunity and because the franchise

was improperly extended in this case and a federal statute prescribed the form of tribal

government for the Osage Tribe, we reverse.[1]

Plaintiffs William S. Fletcher, Charles A. Pratt, Jr., Juanita West, and Betty Woody

("Individual Plaintiffs") brought this action. Defendants include the United States; Bruce

Babbitt, Secretary of the Interior; Ada E. Deer, Assistant Secretary of the Interior for

Indian Affairs; and Gordon Jackson, Superintendent of the Osage Indian Agency

("Federal Defendants"); and the Osage Tribal Council, along with its individual members;

Charles O. Tillman, Jr., Principal Chief of the Osage Tribe; and Edward Red Eagle, Sr.,

Assistant Principal Chief of the Osage Tribe ("Tribal Defendants").

---

[1] On October 6, 1995, Appellants filed a notice of appeal from the district court's order filed September 8, 1995, and entered on the docket September 11, 1995. The district court's docket, however, reflected a pending summary judgment motion filed September 29, 1995. Because the summary judgment motion concerns only attorneys' fees and the order entered September 11, 1995, disposes of all remaining substantive issues in the case, it is a final appealable order. See Budinich v. Becton Dickinson & Co., 486 U.S. 196, 202-03 (1988).

The parties submitted portions of the record in appendices. Each appendix is consecutively numbered. Using the appendices' page numbers, we will refer to the Appendix to Appellant Osage Tribal Council's Opening Brief as "Aplt. App. at _" and to the Supplemental Appendix of the Plaintiffs-Appellees as "Aple. App. at _."

I.  History

In 1881, the Osage people adopted a constitution which established a tribal

government loosely patterned after the United States government.  See H.R. Rep. No. 92-

963, at 7 (1972).  This government operated until 1900, when the Secretary of the Interior

purportedly abolished it.  Id.  However, one division of the government, consisting of a

principal chief, an assistant principal chief, and a 15-member council, refused to dissolve.

Id.

Congress subsequently adopted the Act of June 28, 1906, 45 Stat. 539, which

accomplished several important things.  The 1906 Act called for the creation of a tribal

membership roll,[2] allotted Osage lands, set aside a trust fund consisting of proceeds from

the sale of Osage lands in Kansas and income from the Osage mineral estate, and

prescribed a tribal government.  See H.R. Rep. No. 92-963, at 8.  Each Osage whose

name appeared on the roll received one "headright" in the tribal mineral estate.  Id. at 8-9.

Osages who own an interest in a headright are known as "allotted" members of the Osage

Tribe and have traditionally enjoyed the right to vote in tribal elections, hold tribal office,

and receive a share in quarterly distributions of tribal income.  Id.  Osages born after the

closing of the 1908 roll and who have not acquired a headright interest are known as

"unallotted" Osages and have not enjoyed the right to vote in tribal elections or hold tribal

---

[2]     The roll required under the 1906 Act was closed July 1, 1907, and approved
April 11, 1908.  H.R. Rep. No. 92-963, at 8.  We will refer to it as the 1908 roll.

office.  Id.  By the 1970's, many persons of Osage ancestry did not own headrights and could not vote in tribal elections.  See id. at 9; Felix S. Cohen's Handbook of Federal Indian Law 791 (Rennard Strickland, ed. 1982).  At various times, persons of Osage descent have sought, to no avail, the assistance of Congress and the federal bureaucracy to extend the franchise to include Osages owning no headright interests.

In the 1970's, seven enrolled members of the Osage Tribe filed suit in federal district court seeking a declaration limiting the powers of the Osage Tribal Council.  See Logan v. Andrus, 640 F.2d 269 (10th Cir. 1981). The disposition of the case, which was unfavorable to the seven tribal members, left open the issues of the validity of the restriction of the franchise to headright owners and the validity of the 1881 Constitution. Id. at 270-71.

## II.  District Court Proceedings

Taking up where Logan left off, Individual Plaintiffs filed this suit in federal district court in March, 1990.  They alleged that some of them do not own headrights and do not enjoy the right to vote in tribal elections.  According to their second amended complaint, they sought a declaration on the validity of the 1881 Constitution and claimed that the restriction of the right to vote to headright owners who are 18 years of age

violated the due process clause of the Fifth Amendment and the equal protection clause of Title II of the Civil Rights Act of 1968, 25 U.S.C. § 1302(8).[3]

In August, 1990, Tribal Defendants moved to dismiss the complaint for lack of subject matter jurisdiction, contending that the case was barred by the tribe's sovereign immunity. Federal Defendants joined Tribal Defendants' motion to dismiss.

Ignoring repeated requests for a ruling on the motion to dismiss, the district court set about for over five years to resolve what it perceived to be the voting rights issue. The district court established a commission to propose reforms for the Osage constitution and system of government. The commission proposed a new constitution, which provided for an Osage president, vice president, and a national council. The district court eventually ordered a referendum, and on February 4, 1994, a majority of a greatly expanded Osage electorate voted to adopt the Constitution of the Osage Nation ("1994 Constitution"). Later that year, a president, vice president, and a national council were selected in separate elections. Subsequently, the Bureau of Indian Affairs acknowledged the Osage Nation of Oklahoma by publication in the Federal Register.[4]

---

[3]     The Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301-1303, was approved and signed into law by the President as Titles II through VII of the Civil Rights Act of 1968, Pub. L. No. 90-284, 82 Stat. 77. Section 1302(8) provides that no Indian tribe in exercising powers of self-government shall, "deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law."

[4]     See Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 60 Fed. Reg. 9250, 9253 (1995). The Department of the Interior has promulgated regulations for the recognition of Indian tribes. See 25

On September 8, 1995, the district court issued a final order, which among other things, declared moot Tribal Defendants' motion to dismiss on the ground of sovereign immunity. Not only did the district court not reach the merits of the sovereign immunity defense, it also did not reach the merits of the claims of Individual Plaintiffs.

## III. Case or Controversy

In light of the franchise expansion, the referendum, and the election of new Osage officials under the 1994 Constitution, the district court ruled that the issues raised by the pleadings of Individual Plaintiffs as well as the sovereignty issue raised by Tribal Defendants were moot under both the constitutional and prudential mootness doctrines discussed in Building and Construction Dept. v. Rockwell Int'l Corp., 7 F.3d 1487 (10th Cir. 1993). With respect to the sovereign immunity issue, the district court simply stated that Tribal Defendants' continued assertion of the defense was inappropriate "gamesmanship" and that "[T]he jurisdiction of the Court did not interfere with the sovereignty of the Osage Tribe."[5] Individual Plaintiffs and Federal Defendants assert the reasoning of the district court with the additional contention that Tribal Defendants lack

C.F.R. Part 83 (1996); 25 C.F.R. Part 83 (1995).

[5] See Aplt. App. at 141-42. The district court relied on Tribal Defendants' "cooperation in the referendum process and their agreement that an enfranchisement problem existed that needed to be resolved." E.g., id. at 141. However, as discussed at part V, supra, Tribal Defendants urged the defense at every critical stage of the proceedings and participated in the referendum process because of the district court's orders. While they may have agreed to the existence of a voting-rights problem, they made it clear that they did not consider the district court the proper forum for its resolution.

standing to take an appeal from the district court proceedings because they were not aggrieved by the district court's final order.[6]

### A. Mootness

The constitutional mootness question is a threshold inquiry because a live case or controversy is a constitutional prerequisite to federal jurisdiction. In re Texas Int'l Corp., 974 F.2d 1246, 1247 (10th Cir. 1992). Our review of this question is de novo. Id. Because the doctrine of prudential mootness is concerned with the court's discretion to exercise its power to provide relief, see Penthouse Int'l Ltd. v. Meese, 939 F.2d 1011, 1019-20 (D.C. Cir. 1991),[7] however, we review the district court's determination of prudential mootness for an abuse of discretion.

Under the constitutional mootness doctrine, the suit must present a real and substantial controversy with respect to which specific relief may be fashioned. Lewis v.

---

[6]     Initially, Federal Defendants joined Tribal Defendants' motion to dismiss on sovereign immunity grounds and further moved to have the entire case dismissed, arguing that Tribal Defendants were indispensable parties. See Aplt. App. at 38. Federal Defendants state that they later stopped urging the motion to dismiss once they realized the district court planned to proceed with the referendum process. Brief for the Federal Appellees, at 24 n.11 (filed June 11, 1996); see also Aplt. App. at 173, 177. See generally Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, 13 Federal Practice and Procedure § 3530, at 326-333 (1984) (discussing case or controversy problems engendered by the government changing sides in litigation).

[7]     In Southern Utah Wilderness Alliance v. Smith, _ F.3d _, 1997 WL 137942, at *4, *7 (10th Cir. Mar. 25, 1997), we relied on Meese in reviewing a district court's determination of prudential mootness but did not explicitly articulate a standard of review. Meese articulates that prudential mootness is concerned not with a court's power to provide relief but with the court's discretion in exercising that power. Meese, 939 F.2d at 1019.

8

Continental Bank Corp., 494 U.S. 472, 477 (1990). Also, the controversy must remain alive at the trial and appellate stages of the litigation. Id. at 477-78.

We agree with Tribal Defendants that this case is not moot under the constitutional mootness doctrine. The district court's reasoning with respect to the issues raised in the pleadings of Individual Plaintiffs is understandable, but its reasoning inadequately addresses the sovereign immunity issue and overlooks Tribal Defendants' interests in the state of affairs existing before the referendum. Since the beginning of the proceedings, Tribal Defendants repeatedly challenged federal jurisdiction based on tribal sovereign immunity and have a legally cognizable interest in seeking the vindication of that immunity on appeal. They also have a personal stake in challenging the extension of the franchise to Osages who own no headrights and the formation of a new general governing body under the referendum and 1994 Constitution. These issues represent live controversies. Thus, this case is not moot under the constitutional mootness doctrine. See Murphy v. Hunt, 455 U.S. 478, 481 (1982) (per curiam).

Under the doctrine of prudential mootness, there are circumstances under which a controversy, not constitutionally moot, is so "attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." See Building and Construction Dept., 7 F.3d at 1491-92 (internal quotations and citation omitted). Generally, this doctrine has been applied in cases involving requests for prospective equitable relief by declaratory

9

judgment or injunction. Id. at 1492. A court may refuse to grant relief where it appears that a change in circumstances renders it highly unlikely that the actions in question will be repeated. Id.

At stake in this appeal are significant issues about the sovereign immunity of the Osage Tribe and the validity of the franchise extension and the 1994 Constitution and government. One such issue is the precedent set by the district court's disregard of the repeated assertion of that immunity and its subsequent declaration of the immunity issue as moot in light of the results of the referendum process it ordered. The extension of the franchise and the institution of a new general governing body conflict with Tribal Defendants' legally cognizable interests under the 1906 Act. The district court abused its discretion in applying the doctrine of prudential mootness.

Lastly, Individual Plaintiffs and Federal Defendants argue that the case should be dismissed as moot because it would be inequitable to grant the requested relief under the rationale of In re Chateaugay Corp., 988 F.2d 322, 325-26 (2d Cir. 1993), because Tribal Defendants did not seek mandamus or take an interlocutory appeal under 28 U.S.C. § 1292(a)(1). In Chateaugay, the Second Circuit dismissed an appeal from a bankruptcy court order authorizing ERISA payments where the payments were made during the appeal, because the appellant had allowed an extensive change of circumstances by not availing itself of a rule allowing a party to move for a stay of a bankruptcy court's order during appeal.

10

Although this argument presents a closer question, cf. Workman v. Jordan, 958 F.2d 332, 335 (10th Cir. 1992) (holding an order postponing the consideration of qualified immunity defense until trial was immediately appealable as a collateral order), the case should not be dismissed as moot under the equity rationale of Chateaugay. Tribal Defendants asserted the sovereign immunity defense at every critical stage of the proceedings and sought to have the issue certified for interlocutory appeal. While it is arguable that Tribal Defendants could have sought an interlocutory appeal under 28 U.S.C. § 1292(a)(1) on the ground that the district court's orders directing participation in the referendum process constituted appealable injunctions or that they should have sought a mandamus directing the district court to consider the sovereign immunity issue, dismissing the appeal as moot under equity on these grounds would undermine the rule that a waiver of sovereign immunity must be unequivocally expressed. See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 509 (1991). The unequivocal waiver aspect of tribal sovereign immunity was not at issue in Chateaugay, and on balance with Tribal Defendants' efforts at the district court level in asserting the defense, compels us to conclude that the case is not properly considered moot under the equity rationale.

B. Standing

Federal Defendants and Individual Plaintiffs contend that Tribal Defendants lack standing to take an appeal from the district court proceedings because they were not aggrieved by the district court's final order. Individual Plaintiffs argue that the Osage mineral estate and the Osage Tribal Council's statutory mandate regarding the mineral estate were preserved by the 1994 Constitution.[8]

Standing is another threshold inquiry under the case or controversy prerequisite to federal jurisdiction. Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986). Because Tribal Defendants' standing to appeal is being challenged, we review the question in the first instance. See Arizonans for Official English v. Arizona, 117 S. Ct. 1055, 1997 WL 84990, at *12-*14 (1997).

To have standing, a party must show an invasion of a legally protected interest that is actual or imminent, and concrete and particularized. Arizonans for Official English, 1997 WL 84990, at *12. Likewise, a litigant must possess a direct stake in the outcome in order to seek appellate review. Id. at *12-13. The direct stake requirement ensures that the dispute presented to the court is "presented in an adversary context and in a form

---

[8] See, e.g., Constitution of the Osage Nation, art. II (1994) (stating that ownership of the Osage mineral estate is to be determined according to the 1906 Act as amended); id. art. VII(a) (stating the powers of the national council shall not extend to any action the Secretary of the Interior determines to have an adverse impact on the mineral estate).

12

historically viewed as capable of judicial resolution." Sierra Club v. Morton, 405 U.S. 727, 732 (1972).

The 1906 Act conferred upon the Osage Tribal Council general governmental authority over the affairs of the Osage Tribe, including the right to include the Tribe as a participant in federal programs. Logan v. Andrus, 640 F.2d 269, 270-71 (10th Cir. 1981). The referendum process ordered and monitored by the district court which resulted in the 1994 Constitution, if left intact, would displace the Osage Tribal Council as the general government of the Osage Tribe. Tribal Defendants doubtlessly have suffered an actual, concrete injury. See Goodface v. Grassrope, 708 F.2d 335, 338 (8th Cir. 1983) (holding that incumbent tribal council had standing to appeal district court's order directing Bureau of Indian Affairs to recognize victors of recent council elections as the tribal council). This injury can be determined by reference to specific federal statutes and case law interpreting those statutes. See Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205 (1972) (stating that violations of statutory rights give rise to standing). Thus, Tribal Defendants have standing to bring this appeal.[9]

---

[9] We also have an obligation to examine the standing of the other parties. Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986). Individual Plaintiffs have a personal stake in retaining the rights to vote in tribal elections and to hold tribal office produced as a result of the district court proceedings. Initially, however, they brought suit seeking a declaration on the status of the 1881 Constitution and the validity of the franchise restriction. In their second amended complaint, Individual Plaintiffs allege, "The Plaintiffs are individuals, including 'headright' owners and non-owners of 'headright' interests. Those who are non-owners of 'headright' interests cannot vote in elections for the Chief or the members of the Tribal Council of the Osage Indian Tribe."

V. District Court's Subject Matter Jurisdiction
and Sovereign Immunity of Tribal Defendants

Shortly after this action was filed in district court, Tribal Defendants filed a motion to dismiss it for lack of subject matter jurisdiction, raising the defense of the Osage Tribe's sovereign immunity. Apparently, the district court thought it had the power to consider using one of two methods to address the issues it perceived, and that each method was governed by separate jurisdictional principles. The first method was to address the claim articulated by the pleadings and the motion to dismiss. The second, alternative method was to order a process to resolve its conception of the voting rights issue.[10] Choosing the second and evading the sovereign immunity issue, the district court

In Logan, 640 F.2d at 271, we held that headright owners had no standing to challenge the franchise restriction. Neither the parties nor the district court questioned the standing of any Individual Plaintiff. The parties do not inform us and the second amended complaint does not specify which Individual Plaintiff owns headrights, and any such plaintiff has a standing problem under Logan with respect to the franchise issue. While even non-Indians can bring suit for the denial of equal protection under § 1302(8) of the Indian Civil Rights Act, White v. Pueblo of San Juan, 728 F.2d 1307, 1312 n.1 (10th Cir. 1984), Individual Plaintiffs who do not own headrights in this case base their claim to a right to vote in tribal elections on their possession of some quantum of Osage blood, see Aplt. App. at 48. Individual Plaintiffs assert a basis for standing on these voting claims which is unique in American voting rights law–their race. This basis for standing to bring a tribal voting rights claim has been implicitly recognized before, e.g., Means v. Wilson, 522 F.2d 833, 836, 838-39 (8th Cir. 1975), and is justified in this type of case because of the unique treatment afforded Indian tribes under federal law aimed at preserving tribal sovereignty. They state in their appellate brief without contradiction that Individual Plaintiff Charles Pratt is one-half Osage and owns no headright interest. Thus, Pratt has the standing to represent Individual Plaintiffs' position on this appeal.

[10]     At the status conference held January 31, 1992, the district judge stated, "As I read the cases there's a question of whether the Court can solve the problem directly, but I don't think it's questioned that the Court can involve itself in the creation

14

ruled that it had "sufficient jurisdiction pursuant to [Harjo v. Kleppe, 420 F. Supp. 1110 (D.D.C. 1976), aff'd sub nom. Harjo v. Andrus, 581 F.2d 949 (D.C. Cir. 1978)], to mandate a referendum on the enfranchisement issue and to provide a forum for resolution of the voting conundrum."[11]  After the referendum in 1994, the district court denied the motion to dismiss as moot, stating that its exercise of jurisdiction did not interfere with the sovereignty of the Osage Tribe.

We review de novo the legal question of when a party can assert sovereign immunity.  Sac and Fox Nation v. Hanson, 47 F.3d 1061, 1063 (10th Cir.), cert. denied sub nom. Willingham v. Sac and Fox Nation, 116 S. Ct. 57 (1995).  Likewise, we review de novo a district court's determination of subject matter jurisdiction.  Sierra Club v. Lujan, 972 F.2d 312, 314 (10th Cir. 1992).

"Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories."  Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 509 (1991) (internal citation omitted).  As an aspect of this sovereign immunity, suits against tribes are barred in the absence of an unequivocally expressed waiver by the tribe or abrogation by Congress.  Id.; Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58-59 (1978).

---

of a process [to resolve the voting rights issues]."  Aplt. App. at 147.

[11]     See Aplt. App. at 54, 141.

The Osage Tribe itself is not named as a defendant in this case. However, Individual Plaintiffs sued the Tribe's principal governing body Defendant Osage Tribal Council as well as each individual member, and Defendants Charles Tillman, Principal Chief and Geoffrey Standing Bear, Assistant Principal Chief in their official capacities.[12] Because the relief requested by Individual Plaintiffs, concerning rights to vote in future tribal elections and hold tribal office, if granted, would run against the Tribe itself, the Tribe's sovereign immunity protects these defendants in their official capacities. See Kenai Oil and Gas, Inc. v. Department of the Interior, 522 F. Supp. 521, 531 (D. Utah 1981) ("Tribal immunity may not be evaded by suing tribal officers . . . ."), aff'd, 671 F.2d 383 (10th Cir. 1982). This principle has been applied to protect state and federal

---

[12]     According to the caption of the second amended complaint, Individual Plaintiffs brought their claims against Defendants Charles Tillman and Geoffrey Standing Bear in their individual capacities as well. Tribal sovereign immunity does not protect an official against individual-capacity claims. Santa Clara, 436 U.S. at 59. However, § 1302(8) of the Indian Civil Rights Act speaks only to tribal action, see Dry Creek Lodge, Inc. v. United States, 515 F.2d 926, 934-35 (10th Cir. 1975), and does not authorize a cause of action for declaratory or injunctive relief against either the Osage Tribe or its officers in federal court, see Santa Clara Pueblo v. Martinez, 436 U.S. 49, 59-72 (1978). Also, the Tribe is "unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority." Id. at 56-57 & n.7. The second amended complaint does not invoke any other civil rights statutes by name. It does not make allegations of state action to support claims under § 1983, see Chapoose v. Hodel, 831 F.2d 931, 934-35 (10th Cir. 1987), or allegations supporting a claim under § 1985 or § 1986 for conspiracy to violate civil rights guaranteed under federal law other than § 1302(8), see Nero v. Cherokee Nation of Oklahoma, 892 F.2d 1457, 1461-62 (10th Cir. 1989), or allegations stating a claim under any other federal voting rights act. Cf. Nero, 892 F.2d at 1465-66; Martinez v. Southern Ute Tribe of the S. Ute Reservation, 249 F.2d 915, 919-20 (10th Cir. 1957); Runs After v. United States, 766 F.2d 347, 354-55 (8th Cir. 1985).

16

officials sued in their official capacity. See, e.g., Hafer v. Melo, 502 U.S. 21 (1991) (state); Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 689-90 (1949) (federal). Because there is no reason to treat tribal immunity differently from state or federal immunity in this sense, tribal immunity protects tribal officials against claims in their official capacity. See Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 (1982) (employing same rules for waiver of tribal immunity as are employed for waiver of state and federal immunity because no principled reason required different treatment). Thus, Tribal Defendants were entitled to sovereign immunity as far as the official capacity claims, unless there is an unequivocally expressed waiver either by the Tribe or abrogation by Congress.

Neither Individual Plaintiffs nor Federal Defendants contend that Congress has abrogated the Osage Tribe's sovereign immunity. However, Individual Plaintiffs, relying on Sierra Club v. Lujan, 972 F.2d 312, 314 (10th Cir. 1992), seem to contend that Tribal Defendants should not be afforded the protection of sovereign immunity from suit because they participated in the referendum process and failed to take an interlocutory appeal. Similarly, Federal Defendants contend that Tribal Defendants should have sought interlocutory review under 28 U.S.C. § 1292(a)(1), which provides for interlocutory appeals from district court orders which amount to an injunction.

Notwithstanding their apparent waiver argument, Individual Plaintiffs and Federal Defendants do not point to an unequivocal waiver of sovereign immunity by Tribal

17

Defendants. Tribal Defendants filed their motion to dismiss soon after the original complaint was filed. They reurged it in no less than 15 papers filed with the district court, at virtually every critical stage of the proceedings.[13] The defense was mentioned or urged at each of the three status conferences held in the case. Moreover, at the district court's invitation, Tribal Defendants attempted to have the sovereign immunity issue certified for interlocutory appeal in early February, 1993.[14] However, the district court never certified the issue. Lastly, Tribal Defendants state that they participated in the district court proceedings and the referendum only because participation was ordered by the district court.

While Sierra Club, relied upon by Individual Plaintiffs, represents an example of an instance where we exercised our discretion under § 1292(b) to take an interlocutory appeal on the issue of sovereign immunity, the case does not stand for the proposition that a party waives sovereign immunity in the absence of such an appeal or the request for such an appeal. In any event, Tribal Defendants sought certification of the sovereign immunity issue in February, 1993; however, the district court's inaction effectively denied

---

[13]     For example, Tribal Defendants specifically objected to the referendum process ordered by the district court on the ground of sovereign immunity. See Aplt. App. at 72, 75.

[14]     See Aplt. App. at 82, 84-85. A district court may certify certain issues for interlocutory appeal under the terms and conditions in 28 U.S.C. § 1292(b).

18

review.[15]  Likewise, while §1292(a)(1) authorizes an appeal of a district court's injunction and the district court's orders directing the reformation process arguably are injunctions within the meaning of the section, failure to take an interlocutory appeal under the section does not waive sovereign immunity.  Thus, Tribal Defendants did not waive their sovereign immunity.

The district court ruled its jurisdiction to order a referendum for the resolution of the voting rights issue flowed from Harjo v. Kleppe, 420 F. Supp. 1110 (D.D.C. 1976), aff'd sub nom. Harjo v. Andrus, 581 F.2d 949 (D.C. Cir. 1978).  In Harjo, citizens of the Creek Nation brought suit against various federal officials and the principal chief of their tribe, alleging that the chief had been spending tribal monies without the approval of a Creek national council as required by the Creek Constitution of 1867.  However, the national council had not met in over 60 years.  Ruling that the Creek Nation retained the right to determine its own form of government under various treaties with the United

---

[15]  We doubt whether certifying the jurisdictional issue for interlocutory appeal would have prevented the expense of the referendum process in any event.  In its order filed January 13, 1993, the district court stated that it would "certify the issue to the Tenth Circuit without staying the proceedings herein.  In that way, the referendum preparations may proceed so that, should the Circuit find that this court does have jurisdiction, the process will be completed by the election–as envisioned by the parties."  Aplt. App. at 82.  The district court planned to continue the referendum process notwithstanding an interlocutory appeal, even though a district court generally lacks jurisdiction to proceed during the pendency of an interlocutory appeal taken from the denial of absolute or qualified immunity.  See State of Colorado v. Adhered Mining Co., 916 F.2d 1486, 1490 n.2 (10th Cir. 1990), cert. denied, 499 U.S. 960 (1991); Stewart v. Dongs, 915 F.2d 572, 574-75 (10th Cir. 1990) (vacating judgment rendered after trial held during pendency of interlocutory appeal from denial of qualified immunity defense).

States, the district court ordered a referendum process which allowed the people of the Creek Nation to determine whether they would revive the government and national council under the Creek Constitution of 1867 or whether they would adopt a new constitution. Ultimately, the Creeks adopted a new constitution and government.

Whatever its merits, Harjo is inapposite to this case. Although the principal chief of the Creek Nation was sued in his official capacity, Harjo, 420 F. Supp. at 1115, the opinions of the district court and the District of Columbia Circuit do not indicate that the chief asserted a sovereign immunity defense on behalf of the tribe.[16] Moreover, Harjo did not involve a federal statute which imposed limits on the ability of the Creek Nation to determine its form of government as the 1906 Act does in this case.

Lastly, the district court's statement that its exercise of jurisdiction in mandating the referendum process did not interfere with the sovereignty of the Osage Tribe pays scant attention to the implications of its handling of the proceedings. Tribal sovereign immunity is immunity from suit in federal court. Bank of Oklahoma v. Muscogee (Creek) Nation, 972 F.2d 1166, 1169 (10th Cir. 1992). A conception of immunity from suit which leaves a tribe nonetheless vulnerable to a court's own program of alternative dispute resolution accords no meaningful immunity. It follows that there were not two

---

[16]     Harjo was argued to the District of Columbia Circuit before, and decided just weeks after, Santa Clara was handed down. Since Harjo, the Creek Nation has obtained dismissal of a suit in federal court on the ground of its tribal sovereign immunity. See Bank of Oklahoma v. Muscogee (Creek) Nation, 972 F.2d 1166, 1169 (10th Cir. 1992).

sets of jurisdictional principles from which the district court could select an option allowing it to proceed with ordering and overseeing a referendum process to rework the governing structure of the Osage Tribe.

In summary, Tribal Defendants properly and adequately challenged federal jurisdiction on the ground of tribal sovereign immunity. Tribal Defendants did not unequivocally waive the Tribe's immunity by failing to seek interlocutory review under §1292(a)(1). Harjo, which did not involve the immunity question or statutory limits on the tribe's right to select its form of government, provides no basis for federal jurisdiction in this case. Lastly, the immunity–immunity from suit–deprived the district court of jurisdiction to order and oversee the referendum.

VI. Validity of Referendum and 1994 Constitution[17]

In its final order filed September 8, 1995, the district court ruled that the referendum and the adoption of the 1994 Constitution represent a valid exercise of the power of the Osage people to govern themselves. Echoing this reasoning, Individual Plaintiffs argue that Congress did not intend to disenfranchise Osage descendants by the 1906 Act and that they therefore were able to exercise an inherent right to reorganize their

---

[17]     Individual Plaintiffs and Federal Defendants contend that the results of the 1994 referendum must stand regardless of the district court's jurisdictional error because those results rest on an independently sufficient legal basis–the Tribe's retained power to extend the franchise to Osages owning no headrights and to determine its own form of government. Thus, we must reach the issue of the validity of the referendum and 1994 Constitution.

21

government. They also rely on the precept that any limitation on this power should be clearly expressed in a federal statute as expressed in <u>Bryan v. Itasca County, Minnesota,</u> 426 U.S. 373, 381 (1976) (stating that states would not be presumed to possess the power to tax Indians or Indian property on reservations in the "total absence of mention or discussion regarding a congressional intent to confer" such power).

In contrast, Tribal Defendants emphasize that Congress can limit a tribe's power of self-government. They argue that Congress, in the 1906 Act, defined the Tribe's membership and set its form of general government, and that the referendum and 1994 Constitution are invalid in light of the 1906 Act.

The determination of whether Congress has limited the power of the Osage Tribe to determine its own form of government involves primarily the interpretation of the 1906 Act, its amendments, and subsequent case law. As this interpretation is a question of law, we review the district court's ruling on the validity of the referendum and the 1994 Constitution <u>de novo</u>. <u>See</u> <u>Pierce v. Underwood</u>, 487 U.S. 552, 558 (1988). Although the district court held no evidentiary hearings in its proceedings, the parties did stipulate to certain facts. We review any questions of fact underlying the district court's ruling for clear error. <u>Id.</u>

Indian tribes are separate sovereigns with the power to regulate their internal and social relations, including their form of government and tribal membership. <u>Santa Clara</u>, 436 U.S. at 62-63; <u>United States v. Wheeler</u>, 435 U.S. 313, 322-23 & n.18 (1978); <u>see</u>

22

also Felix S. Cohen's Handbook of Federal Indian Law 247-48 (Rennard Strickland, ed. 1982). These powers of sovereignty are subject to the plenary authority of Congress. See Santa Clara, 436 U.S. at 58. Also, tribes retain sovereign powers except where restricted by treaty or statute or where the exercise of a particular power is inconsistent with a tribe's status as a domestic dependent nation. See Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 208 (1978). Although an express restriction of an aspect of tribal sovereignty is preferred, Congress' clear intent to restrict an aspect of sovereignty is also sufficient even if it is not express. See United States v. Dion, 476 U.S. 734, 738-39 (1986).

The clear intent doctrine has been applied in the context of congressional abrogation of a tribe's treaty rights. In Dion, for example, the U.S. Supreme Court interpreted the language of a federal statute in light of its legislative history to conclude that Congress had the clear intent to abrogate the treaty rights of the Yankton Sioux Tribe to hunt eagles even though the intent was not expressed. The doctrine also applies in the context of reservation disestablishment. See Mattz v. Arnett, 412 U.S. 481, 505 (1973). Moreover, the Eighth Circuit has held that Congress terminated the presumed power of Indian tribes to hear citizen suits brought under the Resource Conservation and Recovery Act of 1976 in the more purely internal context of a suit brought by two tribal members against their tribe and various federal defendants under a citizen-suit provision of RCRA arising out of polluted dump sites on the reservation. See Blue Legs v. United States

23

Bureau of Indian Affairs, 867 F.2d 1094, 1097-98 (8th Cir. 1989). The Blue Legs court based its holding on RCRA's exclusive federal jurisdiction provision and its legislative history, which expressed a congressional preference for prompt federal adjudication of citizen suits under RCRA, and held that RCRA terminated tribal power to hear such suits even though it did not do so expressly. Id.[18]

First, Congress has prescribed the form of tribal government for the Osage Tribe. The 1906 Act as amended established the offices of a principal chief, an assistant principal chief, and an eight-member Osage tribal council, and required that elections be held every four years to fill those offices. See Act of June 28, 1906, Pub. L. No. 321, 34 Stat. 539, 545, § 9; Act of March 2, 1929, Pub. L. No. 919, 45 Stat. 1478, 1481, § 7. A subsequent statute extended the operation of the government until a further act of Congress. See Act of October 21, 1978, Pub. L. No. 95-496, 92 Stat. 1660.

In Logan v. Andrus, 640 F.2d 269, 270-71 (10th Cir. 1981), we rejected the proposition that the Osage Tribal Council as established under the 1906 Act was limited in its governing powers to the administration of the mineral estate. We held that the 1906 Act conferred upon the Osage Tribal Council general governmental authority over

---

[18] Although the Eighth Circuit did not expressly state in Blue Legs that a tribal court could not entertain a citizen suit under the section of RCRA at issue (the court only said that exhaustion of tribal remedies was not required), the Eighth Circuit subsequently explained that Blue Legs had held that a tribal court could not entertain such a suit. See Reservation Telephone Coop. v. Three Affiliated Tribes of the Fort Berthold Reservation, 76 F.3d 181, 185-86 (8th Cir. 1996).

the affairs of the Osage Tribe, including the right to include the Tribe as a participant in federal programs. Id. at 270. In Logan, we explained that Congress' description of the government established by the 1906 Act as the "tribal government"[19] is significant and resolves the question of its general authority.[20] Id.

The legislative history of the 1906 Act makes it clear that the act was passed with the approval of the Tribe and in its interests. See H.R. Rep. No. 3219, at 102 (1906). The House Report expressly notes that the 1906 Act made "ample provision for the . . . tribal government." Id. at 2. Not only did Congress ordain the structure of the tribal government, it also set the terms of office and provided for the time and place of general tribal elections, the succession of officers, and the removal of members of the Tribal Council. In spite of its knowledge of the problems with the statutory government,[21]

---

[19] See, e.g., Act of March 2, 1929, Pub. L. No. 919, 45 Stat. 1478, 1481 ("said tribal government shall continue in full force and effect . . . ."); Act of October 21, 1978, Pub. L. No. 95-496, 92 Stat. 1660 (same).

[20] Congress also assigned governmental functions to the principal chief and the Osage tribal council that are not directly related to the administration of the Osage mineral estate. See, e.g., Act of June 28, 1906, Pub. L. No. 321, 34 Stat. 539, 542-43 (stating that certain reserved lands may be sold "in the discretion of the Osage tribe"); id. at 544 (providing that the "Osage tribal council" may request payments from an emergency fund for the Osage tribe); id. at 545 (stating deeds to Osage lands "shall be executed by the principal chief for the Osages"). The legislative history of the 1906 Act also indicates that Congress was providing for a tribal government concerned with more than the mere administration of the mineral estate. See H.R. Rep. No. 3219, at 1-2 (1906).

[21] In 1957, Congress recognized problems in "the present form of government of the Osage Tribe." See H.R. Rep. No. 965, at 1, reprinted in 1957 U.S.C.C.A.N. 1688. The Committee on Interior and Insular Affairs directed the Bureau of Indian Affairs to

25

Congress extended its operation indefinitely in 1978. The legislative history of this 1978 amendment shows that Congress was aware that it was dealing with the "tribal government," see S. Rep. No. 95-1157, at 5 (1978), and the amendment reinforces the conclusion that Congress was aware of its prescription of the form of tribal government by not only extending its operation indefinitely but also by providing for a method of selecting a principal chief and a tribal council in the event of a common disaster, see id. at 9; Act of October 21, 1978, Pub. L. No. 95-496, 92 Stat. 1660, § 1. Until the referendum, the United States government recognized Defendant Osage Tribal Council as the general governing body of the Osage Tribe.[22] Moreover, the Council has operated under the 1906 Act since its passage–not the 1881 Constitution.[23]

The referendum process ordered by the district court produced the 1994 Constitution, which creates a new general government for the Osage Tribe. The 1994 Constitution separates the powers of the Osage Nation into the legislative, executive, and judicial divisions and confers those powers on a national council, a president and vice-president, and a supreme court, respectively. Although the 1994

---

review and report to the committee on a proposal to reorganize or enlarge the form of the Osage government to provide representation to adult members of the Tribe who were not owners of headrights. See id. The Bureau of Indian Affairs apparently did not act on this mandate.

[22]    See Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed. Reg. 54364, 54367 (1993).

[23]    See Aple. App. at ¶¶ 5-6, at 3; S. Rep. No. 95-1157, at 4-7, 12-14 (1978).

Constitution makes some provisions to preserve the power of the government established by the 1906 Act over the Osage mineral estate, the government created by the 1994 Constitution is a government wielding general authority, designed, according to the constitutional preamble, to secure to the Osage Nation the blessings of freedom and the Osage ancestral heritage and culture. This establishment of an entirely new form of tribal government exercising general powers is inconsistent with Congress' statutory prescription of the form of tribal government for the Osage Tribe. We hold that Congress clearly intended to terminate the power of the Osage Tribe to create a new form of tribal government inconsistent with the statutory form, see Felix S. Cohen's Handbook of Federal Indian Law 247 (Rennard Strickland, ed. 1982) (recognizing the 1906 Act as an "effective limitation on self-governing powers"), as the Tribe did in the 1994 Constitution. Because Congress' prescription of a form of tribal government and the restriction of a tribe's powers over internal affairs in this way appears unique in its relations with Indian tribes, see id. at 247 & n.11,[24] our holding in this matter is correspondingly narrow.

---

[24] "In a few instances, Congress has by statute dictated the manner of choosing tribal officials or other aspects of a tribe's form of government." See Felix S. Cohen's Handbook, at 247. Cohen supports this statement by reference to the 1906 Act and to only one other act, the Act of April 26, 1906, ch. 1876, § 6, 34 Stat. 137, 139. This act is a smaller intrusion on tribal sovereignty as it mainly confers upon the President of the United States the power to remove from office certain officials of five specified tribes for failure to perform official duties and to appoint replacements in the event of such removal or an official's permanent disability.

Second, the district court ordered the expansion of the Osage franchise to persons who were not entitled to vote under regulations promulgated by the Department of the Interior,[25] and the 1994 Constitution approved this expansion. The district court declared that "all persons listed on the 1906 roll and their descendants by blood (but without regard to Indian blood quantum) will be eligible for membership in the Tribe and will be permitted to vote in the referendum."[26] The district court's final order of dismissal confirms that the franchise was expanded to all registered lineal descendants of persons whose names appear on the 1908 roll, without regard to headright ownership, and the certificate of ratification of the 1994 Constitution echoes this expansion.

The franchise extension as created in this case is invalid. The district court's orders expanding the franchise in the first instance are invalid because they were issued without subject matter jurisdiction. Moreover, because the form of tribal government created by the 1994 Constitution, its major provision, is inconsistent with the form of government prescribed for the Osage Tribe in the 1906 Act, the 1994 Constitution is invalid. Accordingly, the 1994 Constitution's ratification of the franchise extension is void. Because we decide this issue on grounds independent of the 1906 Act, we need not

---

[25]    E.g., 25 C.F.R. §73.21 (1978).

[26]    See Aplt. App. at 55, 67.

28

decide the issue of whether the 1906 Act terminates the Osage Tribe's power to extend the right to vote in its elections to persons not owning headrights.[27]

In summary, Congress terminated the power of the Osage Tribe to create a form of tribal government inconsistent with the prescription of the 1906 Act. Thus, the government created by the 1994 Constitution is invalid. Also, the extension of the franchise, ordered by the district court and ratified in the 1994 Constitution, is void.[28]

## VII. Remedy

Contending that the 1906 Act is not an idle choice of words and that only Congress can expand the franchise tied to headright ownership and replace the tribal government, Tribal Defendants maintain, as we confirmed at oral argument, that the right to vote in tribal elections should be returned to headright owners only and that the government prescribed by the 1906 Act should be restored as the sole government of the Osage Tribe. Tribal Defendants also contend that this remedy is necessary to vindicate the sovereign immunity of the Osage Tribe. In short, Tribal Defendants argue that we should provide a

---

[27] The issue of the extension of the franchise is on a different footing than the issue of the validity of the form of government created by the 1994 Constitution. If the Osage Tribe retained the power to create a form of tribal government inconsistent with the 1906 Act's prescription, then the district court's error in retaining jurisdiction would not require reversal of the results of the 1994 referendum.

[28] We hold only that the franchise was improperly extended in this case and that the new government formed under the 1994 Constitution is invalid under the 1906 Act. The issue of whether the headright restriction violates Individual Plaintiffs' equal protection and due process rights, as raised by the second amended complaint, remains an open question.

29

remedy which would put the parties back in the position in which they would have been had the district court properly dismissed the case on grounds of sovereign immunity at the outset of the action and had no referendum been held.

Individual Plaintiffs and Federal Defendants contend that we have no authority to grant the remedy sought by Tribal Defendants. They contend that the Osage Nation has a legal existence independent of the district court proceedings such that a reversal of the district court would not result in the restoration of the government established by the 1906 Act as the sole government. Ironically, they contend that the Osage Nation enjoys sovereign immunity, which precludes us from providing the remedy sought by Tribal Defendants. They also rely on the traditional reluctance of federal courts to interfere in the results of tribal elections or involve themselves in internal tribal disputes. Lastly, at oral argument, they suggested that the decision to recognize officially an Indian tribe is a task exclusively committed to the executive branch and that we should leave the task to that branch.

A. District Court's Relationship to Referendum

In light of the contention by Individual Plaintiffs and Federal Defendants that the 1994 Constitution and its government assume a legal significance independent of the district court's actions by way of the referendum process, the breadth of the remedy requested by Tribal Defendants, and the principle that we are particularly concerned with judicial error, any remedy we fashion in this case should be justified by a close relationship between the actions of the district court and the referendum and 1994 Constitution. We turn to examine that relationship.

The district court's actions are inseparable from the referendum and 1994 Constitution. The district court did not merely initiate a process which was then carried out by the parties. Departing from the task of deciding the issues in the pleadings,[29] the district court ruled that it had "sufficient jurisdiction" to "mandate a referendum on the enfranchisement issue and provide a forum for resolution of the voting conundrum." It ordered the creation of a commission to propose a revision of the existing documents governing the Osage Tribe, and required the commission to submit all its proposals to the

---

[29] See, e.g., Aplt. App. 147 (Transcript of Status Conference held Jan. 31, 1992) ("As I read the cases there's a question of whether the Court can solve the problem directly, but I don't think it's questioned that the Court can involve itself in the creation of a process and I think that that might be the direction that this case should take."); id. at 158 ("My view is that the best solution for the parties is to attempt to resolve this matter in the way that [Federal Defendants] suggest [after the manner of Harjo.]"); id. at 161 ("I will hang on to this process because I think I should, and keeping in mind that ultimately I'll have a hard look at the jurisdictional issue.").

court for its review. The district court retained continuing jurisdiction over the work of the commission and the referendum process.

Additionally, the district court played an integral and commanding role in the referendum process. The district court issued a comprehensive order governing the commission and the referendum process, requiring an educational program on the referendum, and mandating election of new Osage officials. It directed or attempted to direct the parties past numerous points of potential conflict, not only on the methods for conducting the referendum but also on issues relating to the composition of the commission, whether commission meetings would be open to the public, the exchange of information between commissioners, deadlines, expansion of the franchise and preparation of a master tribal membership and voting list, an educational program about the referendum, referendum funding, and commissioner compensation. It also required the Secretary of the Interior to submit his views on whether the new proposed governing documents contravened federal law.

Lastly, the district court actively avoided the issue of sovereign immunity. Although Tribal Defendants raised the issue shortly after the commencement of the action in their motion to dismiss for lack of subject matter jurisdiction, the district court evaded[30]

---

[30] At the status conference held October 9, 1992, the district judge stated, "I also recognize the urging of the Council that the Court rule on the motion to dismiss but I'm going to have to consider that as cleverly as I can." See Aplt. App. at 220. The judge also stated, "I'm convinced that I have jurisdiction and that we're proceeding appropriately in this case, but I will do it [consider the sovereignty issue], as I say, in

the motion for several years[31] and ultimately denied it as moot in light of the results of the referendum it ordered.  When one Tribal Defendant requested a ruling on the motion to dismiss at the status conference on October 9, 1992, well before the referendum, the district judge immediately turned to the attorney for Federal Defendants, who by this time had abandoned their initial position and embraced the referendum, and asked:

> Is this an issue that is going to be urged seriously . . . ?  The Court had felt that we were on course for working out a plan, of having the parties with the aid of the Court agree to a process or plan for resolving this voting issue.  I'm hearing the argument from [one Tribal Defendant] that really they want the judicial system to address some of the legal issues in a manner that could cause an appeal before the plan had been worked through, and this is kind of a new tact [sic] that could possibly throw a wrench into the process.[32]

The district court made no bones about the fact that it did not intend to let the sovereign immunity issue stop the referendum.

---

whatever means I can do it to ensure that our process continues, because I am reading your mind [in urging the motion to dismiss]."  Id. at 221-22.

[31]    The district court abused any discretion it had by exceeding the bounds of permissible choice under the circumstances, Moothart v. Bell, 21 F.3d 1499, 1504-05 (10th Cir. 1994), in failing to rule on the motion attacking subject matter jurisdiction within a reasonably short time.  See Workman v. Jordan, 958 F.2d 332, 335 (10th Cir. 1992) (reversing district court's order postponing consideration of qualified immunity defense until trial and directing district court to immediately consider the defense); Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.") (emphasis added).

[32]    Aplt. App. at 172-73.

The district court's actions are inseparable from the referendum and 1994 Constitution. The district court's actions were possible only because it disregarded the sovereign immunity defense. Not only is the existence of the referendum not independent of the district court's actions, but its validity is seriously undermined by the disregard of the sovereign immunity defense. Moreover, any purported independent validity of the referendum and the 1994 Constitution is undermined by the departures from the statutory prescription of the form of tribal government for the Osage Tribe.

## B.  Appropriateness and Form of Relief

Congress prescribed the form of government in the 1906 Act as amended, thereby restricting the Tribe's power to create a form of government inconsistent with the statutory form. The principle that only Congress has the power to amend an otherwise proper federal statute is well settled. For example, in <u>Kennerly v. District Court of the Ninth Judicial District of Montana</u>, 400 U.S. 423, 425-26 (1971) (per curiam), the U.S. Supreme Court rejected a state's claim that it had jurisdiction over a civil case arising on the Blackfeet reservation because the state legislature had not taken affirmative legislative action to extend such jurisdiction in accordance with a federal statute. In light of the statute, the Supreme Court rejected the proposition that the Blackfeet Tribal Council's specific authorization of coordinate state court jurisdiction in such cases was sufficient. <u>Id.</u> at 427, 429. <u>Kennerly</u>, thus, confirms that action by a recognized tribal authority

34

cannot overcome a statutory requirement, even where protection of a tribal interest underlies the statute.

As an appellate court, we have the power to provide an appropriate and meaningful remedy to correct judicial error of a district court. In this case, the district court had far more than a causal relationship to the referendum process. The district court ignored numerous requests for a ruling on the sovereign immunity issue, proceeded without jurisdiction, assumed powers which can only be described as legislative in scope, and commanded a constitutional referendum–a remedy far in excess of that requested by the pleadings–despite a congressional act and precedent of the U.S. Supreme Court and this circuit to the contrary. In this case, the appropriate and meaningful remedy is to restore the form of government established by the 1906 Act by striking down the inconsistent form created by the 1994 Constitution and to declare the extension of the franchise void.

The District of Columbia Circuit granted a similar remedy in Morris v. Watt, 640 F.2d 404 (D.C. Cir. 1981), where the court vacated the results of tribal referendum elections adopting new constitutions for the Chickasaw and Choctaw Nations on grounds of procedural irregularities.[33] Other courts have also formed remedies in tribal election

---

[33]     Because the tribes in Morris retained the power to adopt new tribal constitutions, the District of Columbia Circuit then remanded the case for new referendum elections. Morris, 640 F.2d at 406, 415-16. We disagree with any contention that the results of the district court proceedings in this case are immune from review because of the 1994 tribal referendum. While, as Federal Defendants point out, Morris involved procedural irregularities not at issue in this case, the importance of Morris for our purposes is that the case serves as an example of an appellate court vacating the

35

disputes even though the remedies interfered with some aspect of tribal control over the election.  See, e.g., Rosebud Sioux Tribe of S. Dakota v. Driving Hawk, 534 F.2d 98 (8th Cir. 1976) (affirming district court's order directing a tribal secretary to issue a certificate of election to all but two candidates in a tribal election where the court determined the candidates had been properly elected even though the tribal election board had refused to certify the election results and had ordered a new election); Means v. Wilson, 522 F.2d 833, 839-42 (8th Cir. 1975) (holding tribal members stated a claim against the tribal election board for interference with their right to vote in tribal elections under § 1302(8) based on allegations of procedural misconduct aimed at ensuring the election of the incumbent council president), cert. denied, 424 U.S. 958 (1976); Solomon v. LaRose, 335 F. Supp. 715 (D. Neb. 1971) (issuing a preliminary injunction prohibiting tribal council from executing its resolutions ousting three newly-elected council members because the council exceeded its authority over tribal elections as set by tribal election ordinance).

Both Individual Plaintiffs and the new Osage National Council, in its amicus brief, assert that the Osage National Council possesses sovereign immunity which precludes us from granting the relief requested by Tribal Defendants.  However, the immunity of the

---

results of referendum elections in which Indian tribes adopted new constitutions.  Instead of relying on the procedural irregularities at issue in Morris to justify our reversal of the 1994 referendum, we rely on our conclusions that the district court lacked the subject matter jurisdiction to order the referendum process and the expansion of the franchise in light of the asserted tribal sovereign immunity and that the 1906 Act prescribes the form of tribal government for the Osage Tribe, thereby restricting the Tribe's power to create a form of government inconsistent with the statutory form.

36

Osage Tribe was properly asserted by Tribal Defendants at the outset of this suit, and

granting the relief requested by Tribal Defendants vindicates that immunity. Indian tribal

sovereign immunity would be a poor shield if it could be disregarded at the will of a

district court or if a court could command resolution of tribal affairs in such a way as to

put the vindication of immunity beyond the fashioning of a remedy at the appellate level.

The Osage National Council cannot assert that immunity to bar relief.[34]

Federal Defendants point to Two Hawk v. Rosebud Sioux Tribe, 534 F.2d 101 (8th

Cir. 1976), and Wheeler v. Swimmer, 835 F.2d 259 (10th Cir. 1987), as examples of the

reluctance of federal courts to interfere with the results of tribal elections or involve

themselves in internal tribal disputes. However, both cases are distinguishable.

In Two Hawk, the Eighth Circuit dismissed an appeal regarding a challenge to a

tribal election as moot where the appellant failed to seek a stay of the election, which was

---

[34]     Federal Defendants and the Osage National Council also contend that
proper relief cannot be granted in the absence of the Osage National Council as a party.
However, the Osage National Council failed to file a notice of appeal on the district
court's denial of its motion to intervene and has thus waived the issue. See In re Grand
Jury Subpoenas Dated December 7 and 8, Issued to Bob Stover, Chief of Albuquerque
Police Dept. v. United States, 40 F.3d 1096, 1099 (10th Cir. 1994) (stating a denial of a
motion to intervene is a final appealable order), cert. denied sub nom. Nakamura v.
United States, 115 S. Ct. 1957 (1995); Sanguine, Ltd. v. United States Department of the
Interior, 736 F.2d 1416 (10th Cir. 1984) (reversing district court's denial of tribal
members' motion to intervene). Similarly, the Osage National Council did not move to
intervene on appeal. See Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp.,
510 U.S. 27, 29 (1993) (dismissing writ of certiorari because Court would have had to
decide appellate court's denial of petitioner's motion to intervene on appeal before
reaching merits and petitioner failed to include the denial in the petition for certiorari).

completed during the appeal. The <u>Two Hawk</u> court carefully noted that the case did not involve an attack on an allegedly invalid election ordinance or a statute which imposed unwarranted burdens on candidates in future elections and, thus, future elections would not be affected. In contrast, the 1994 Constitution and the new government at issue in this case pose enduring conflicts with the 1906 Act and Tribal Defendants' cognizable interests.

In <u>Wheeler</u>, we affirmed the district court's refusal to exercise jurisdiction over the claims of defeated candidates in a tribal election, where resort to the tribal judicial system was available, under the rationale of <u>Santa Clara</u>. In this case, we are following the animating principle of <u>Wheeler</u> and <u>Santa Clara</u> by providing Tribal Defendants their requested relief.

Individual Plaintiffs and Federal Defendants contend that the decision to recognize officially an Indian tribe is exclusively committed to the executive branch and that we should leave the task to that branch. Many administrative functions concerning Indian affairs have been delegated to the executive branch by way of the Department of the Interior, <u>e.g.</u>, 25 U.S.C. §§ 1-9, and the Department has procedures for officially recognizing Indian tribes, <u>see</u> 25 C.F.R. Part 83 (1996). Congress, however, has the power to regulate commerce with the Indian tribes, U.S. Const. art. I, § 8, and Congress has spoken to the governing of the Osage Tribe in the 1906 Act. There is no "textually demonstrable constitutional commitment of the issue[s]" relevant to this case to the

executive branch to render the case nonjusticiable.  See Baker v. Carr, 369 U.S. 186, 217 (1962).  The principal issue in this case is the adherence of the district court and the parties, including Federal Defendants, to the 1906 Act and the doctrine of tribal sovereign immunity as interpreted in binding precedent such as Logan and Santa Clara.[35] Construction of the 1906 Act and the applicable precedent and judging the adherence to this authority are eminently judicial tasks.[36]

---

[35] Additionally, Tribal Defendants allege in their reply that the procedures for recognition of the Osage Nation set out in 25 C.F.R. Part 83 (1995) were not followed in spite of the publication in the Federal Register.  See Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 60 Fed. Reg. 9250, 9253 (1995).  Resolution of the question of whether the procedures were followed involve evidentiary matters not before us and is a question we would not decide in the first instance.

[36] In its final order dismissing the case, the district court reasoned because it had the jurisdiction to order the referendum, Tribal Defendants were not necessary parties.  To the extent the district court is intimating that any error it made regarding the sovereign immunity defense is immaterial because it could have ordered the same result in Tribal Defendants' absence, we disagree.

A party is a necessary party if it claims an interest relating to the subject of the action and is so situated that the disposition of the action in the party's absence may as a practical matter impair or impede the party's ability to protect that interest.  Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 109-10 (1968); Fed. R. Civ. P. 19(a).  Tribal Defendants were necessary parties whether this test is applied in relation to the relief requested by Individual Plaintiffs, the invalidation of the franchise restriction and what amounted to the revival of the tribal government under the 1881 Constitution, or in relation to the relief actually granted, the franchise extension and a new constitution and government.  The relief requested in the second amended complaint posed a practical threat to the ability of Tribal Defendants to protect their interest as the sole governing body of the Tribe as well as to meet their obligations to protect the Osage mineral estate, while the actual results of the district court proceedings directly compromised those interests.  Moreover, Tribal Defendants were indispensable because the case, essentially an internal tribal dispute, could not in equity and good conscience proceed in their

In summary, the appropriate and meaningful remedy in this case is to resurrect the restriction of the franchise to headright owners and to restore the government established by the 1906 Act, by striking down the inconsistent form created by the 1994 Constitution. This remedy is justified by the inseparable role of the district court in the referendum and its error in refusing to honor the sovereign immunity of the Osage Tribe urged repeatedly by Tribal Defendants. The remedy is fundamentally appropriate given the departures from the 1906 Act and vindicates the Tribe's sovereign immunity.

## VIII. Conclusion

Congress prescribed the form of tribal government for the Osage Tribe in the 1906 Act as amended, thereby restricting the Tribe's power to create an inconsistent form of government. Also, the extension of the franchise in this case is void. The district court erred in failing to timely rule on Tribal Defendants' motion to dismiss on the ground of sovereign immunity. The district court further erred in ordering and presiding over the extension of the tribal franchise and the referendum process, working a fundamental change in the form of the Tribe's government. Outside the power of judicial review or circumstances requiring court-supervised implementation of a constitutionally-required

---

absence, Fed. R. Civ. P. 19(b), in light of Tribal Defendants' interests. We have dismissed cases under Rule 19(b) when a tribe cannot be joined to a suit on account of sovereign immunity. See, e.g., Enterprise Mgt. Consultants, Inc. v. United States, 883 F.2d 890, 893-94 (10th Cir. 1989); Tewa Tesuque v. Morton, 498 F.2d 240, 242-43 (10th Cir. 1974), cert. denied, 420 U.S. 962 (1975); United Keetoowah Band of Cherokee Indians v. Mankiller, 2 F.3d 1161, 1993 WL 307937 (10th Cir. Aug. 12, 1993) (unpublished opinion).

40

remedy superseding any contrary statute, e.g., Cooper v. Aaron, 358 U.S. 1 (1958) (striking down suspension of school desegregation plan under Brown), a district court cannot provide what amounts to a legislative forum for resolution of issues fit solely for Congress simply because Congress and the federal bureaucracy have proven too slow, unresponsive, or otherwise unsatisfactory.  Only Congress has the power to permit a fundamental alteration of the prescribed form of tribal government.  The results of the district court proceedings and the 1994 referendum are reversed.  The right to vote in elections of the Osage Tribe is restricted to headright owners, and the form of government established by the 1994 Constitution is declared invalid.